Good morning, Your Honors. Stephen Zellig on behalf of Mr. Radocchia. What occurred here was shocking at all levels. Mr. Radocchia was an acclaimed teacher. He unfortunately ran into Ms. Powell, but a long history of making false accusations against people. Mr. Zellig, your time is going to be limited. Will you please address the issues rather than commence a oration that might be more akin to a jury argument? Well, I think the first issue is... For instance, did McPartland have probable cause to arrest Radocchia? Number one issue. Talk to that. She did not. Why do you say that? Because probable cause is based on a totality of circumstances. Probable cause must be evaluated based on reliable and trustworthy data. Probable cause must include a consideration of inconsistencies. Probable cause must... Which of those items do you say turns the case your way that there is no probable cause to arrest Radocchia? In view that, McPartland had evidence from two independent relations of what the children had said regarding his exhibition, the mother and the nurse. Isn't that enough? Well, a mother who didn't see it, who translated for her daughter, who led her daughter. The daughter was grossly inconsistent. Initially, she didn't say anything about an exposure. And the nurse... So your basis is that the mother's objection or the mother's relation of the crime was objectively not trustworthy and therefore cannot be the basis of reasonable cause? Well, not only was the mother skewed and distorted with a long track record of false accusations, an incredible track record. Was that known to McPartland? Yes, it was. The mother, the two serial accusers, Sonia and Jason Powell, recognized that it might come up and immediately reported it to McPartland, who said nothing about it whatsoever in her reports. She distorted the facts in her reports and her declaration of probable cause. She distorted her reports. If she could find a consistency, she wrote it down. But there was an overwhelming level of inconsistencies, including the fact the crime could not have physically occurred, as alleged, because you had this tiny window, minutes, where the crime allegedly occurred. Did they have a classroom teacher saying that Radokia was absent from the classroom with the two alleged victims for seven minutes? The two children left the class at 2.20 by themselves. Mr. Radokia left the class at 2.25. Sonia Powell saw her daughter at 2.25. It could not have occurred. It was impossible. Moreover, the school was – You didn't answer my question. I'm sorry. I missed it. Didn't the classroom attendant or other substitute teacher or co-teacher say that the two victims were absent from the classroom for seven minutes at the same time that Mr. Radokia was absent? I don't think so, Your Honor. I think that Bibler said that Radokia left at 2.25 and was out, and she observed him washing paintbrushes in the yard right out of the window of the classroom. This is at the same time that Sonia Powell, who arrived at 2.20 at the school and could view into the school and saw her daughter, observed her daughter. Moreover, where did it occur? If it occurred in the bathroom, there were several witnesses who said they never saw Radokia in the bathroom and saw the little girls. If it occurred in the shed, that was also not possible because it was an extended distance away, and it was also inconsistent with Sonia's observations and the substitute teacher's observations. And bear in mind there were about 60 people on ground who also saw nothing. They left the school that day without reporting anything. And the initial report was he had showed the little girl, E.P., a lizard. Then McPartland stepped in with her unbelievable attitudes that males should not teach. I'm going to get one a day. Oh, there's a picture of him. Oh, he's Mexican. She's making these comments. Counsel, counsel, counsel. Sorry, Your Honor. Hold up a second. We know from Al Kidd versus Ashcroft that the subjective biases and impressions of arresting officers are totally irrelevant to the issue whether there was probable cause for the arrest. The only question is was there objective evidence from which the police officer could base his arrest. So I tell you again, there are three judges here, not 12 persons and a jury. Tell us under the law what about the reasonable probable cause was absent in the arrest by McPartland. Because she did not consider the totality of circumstances, that she did not consider the mountain of exculpatory evidence, the mountain of inconsistencies, the fact it could not have physically occurred, the time element, the fact that the children had changed their stories, the fact that another child who was allegedly involved said nothing occurred, the fact that the stories between the two children were unreliable, the fact that the mother of the other child reported to McPartland that she thought it didn't make any sense and it was just didn't make any sense, the fact that they didn't follow proper protocols and led the witnesses. And even when they led the witnesses, they developed exculpatory evidence that was never reported by McPartland. And that demonstrates that she looked only at what she wanted and that is completely inappropriate. As she admits, she admits that I must look at everything. LAPD admits that you have to look at the whole case, including the exculpatory evidence. The case law says you must report everything. The case law says probable cause is based only on reliable and trustworthy evidence. So there was no probable cause here. The reports that McPartland submitted were wrong in two major ways. First, the facts were distorted. If there was a consistency, she reported it. She did not report any inconsistencies. In addition, she did not report the mountain of exculpatory evidence and the fact that this crime was physically impossible. So that's why I believe that there's an overwhelming case here. I think that what the trial court did was he looked at the arrest reports and the declaration of probable cause and said, okay, if all of these things are correct, there's probable cause. But that missed the point. The reports were distorted and there was a mountain of exculpatory evidence that wasn't reported. So that's where the mistake occurred. And that all was presented to the court. Absolutely. Extensively cited. As you can see from the record, there was a very strong effort here to marshal the facts. And the facts as demonstrated show that this was a distorted investigation and a distorted purported finding of probable cause. Bear in mind the prosecutor testified that she relied solely on the accuracy of the declaration and the investigative reports relied solely. And had she known what we demonstrated in these briefs, she would not have prosecuted. She said she relied solely on the good faith, the integrity, the completeness, and the accuracy of McArthur. But the reports were skewed and distorted. And then, of course, the story enlarges even more. For 20 or so days after Rodokia is arrested, all of a sudden it changes. And now Rodokia is accused of inserting an object in the little girl. Now, Rodokia was charged with violating a statute that required restraint. Never, ever, ever any evidence of that. None, zero. And a touching, no evidence of that. None, zero. And an accomplice. That's what he was charged for. Where is there probable cause here? Even if we believe fully, the stories of the little girls, stories are grossly inconsistent, that there was a crime involving a restraint, a touching, and an accomplice in these seconds that this crime could have occurred at this tiny school in full view of 60 or so people. That's a jury argument. You know, I tell you, I like a little jury argument on appeal because your job is to sell. You're convince us. And we've got to get the full picture. And you have to look at all the circumstances. Just generally. Mr. Ziele, can you tell me, what was the exculpatory evidence that McPartland knew of before the arrest? She knew that the little girl's stories had changed dramatically and was inconsistent. That's exculpatory evidence. She knew that the story of the little girl. You never got this information. We got it and submitted it to the court in civil action. Yeah, but I mean, you didn't have it at the time of when this probable cause. McPartland had it at the time. She absolutely did have it. She didn't give it to you. She did not. She distorted the reports and completely ignored exculpatory information. E.P., when she was asked leading questions at Katz, gave answers that completely cleared Radokia. And McPartland came in and lied to E.P. and said that Radokia is sorry for what he did and you need to give us the answers that you need us to give for your own protection. The fact that it was a physical, the event was physically impossible. The fact that one of the little girls reported that Mr. Radokia, after being prompted and led by the mother, reported that Radokia had exposed himself in the classroom in front of all the children and a teacher who wasn't there that day. I mean, that kind of exculpatory data was not included. I mean, I think the fact that Ms. Powell makes accusations against pediatricians, nannies, her own father, neighbors, and a four-year-old. Ms. Powell was on record at the time, and McPartland knew it, that Ms. Powell had made an accusation of sexual misconduct against a fellow student of one of her daughters who was four years old. She knew that before the arrest? Absolutely she did. And the reason she knew it is because the Powells told McPartland, you might need to know this just in case. It's absolutely without controversy that McPartland knew all of this. I mean, I've laid out the misrepresentations and the exculpatory data in my opening brief beginning at page 34 and continuing. I have 22 separate items which we consider to be exculpatory, inconsistent, and demonstrating the innocence of Radokia, the complete innocence of Radokia, beginning at page 34 of my brief and continuing through page 41. I mean, this and then the prosecution occurs for the strength with an accomplice and a touching, which never occurs by all persons' admissions. Radokia refuses all plea bargains. He's told incredibly by a city attorney representative at a Trader Joe's, quote, off the record, do not enter a plea. They will dismiss. The charges are dismissed. By the way, it's not very well set out. I was noticing last night and this morning, there was a governmental tort claim filed within six months of the termination of the action. So the argument that there was no governmental tort claim is simply not right. And that governmental tort claim, which is about 25 pages long and in full factual detail, can be located at page ‑‑ I'll get it for you in a second. It's in the appendix. Is your claim that the governmental tort claim act was timely filed because it was filed within six months of the dismissal of the city attorney's charges? I'm claiming very close. The criminal charges were dropped on January 1609. The governmental tort claim was filed on July 9th, 09. Does the governmental tort claim act commence when the plaintiff has reasonable suspicion that his rights are being violated regardless when the criminal charges are dropped? Not on a malicious prosecution. The final element. But if there's probable cause, there can't be no malicious prosecution. Do you agree with that? If there's probable cause. To arrest. Yes. Okay. But this is a summary judgment. Somebody needs to evaluate the state of mind of this officer who should not have been in the position she was in, ridiculous, with her outspoken views that males should not teach. And I know I'm arguing to the jury again, but it's pretty outrageous. And the city investigated, gave her high marks. She violated, she did two things. She violated city procedure, and some of the city procedures, intriguingly, through Malinka, the person most knowledgeable, said there is no city procedure for investigators to marshal and to preserve exculpatory evidence. That is astounding. By the way, on the state claims, there's another point that I would like to make. The matter was dismissed, right? Yes. And was there any request made for a stipulation of probable cause? Sometimes they do that. You know, there's a little dismiss, and if you'll stipulate that there was a probable cause. I can't tell you. I do not believe so, Your Honor. I don't believe that occurred, but I'm not 100%. But remember, the state claims a person, just because they're a police officer or a judge or some other position, you have certain immunities, that they don't stick with you at all points in time, as we know from the Solis case, S-O-L-I-Z, that we discussed in our brief, where the judge was sitting in the courtroom, made certain comments. Of course, it's all, he's subject to complete, absolute immunity, but when he entered the hallway and made inappropriate comments and defamatory comments in his position as a private person, he's no longer protected by the immunities. And that's what also occurred here. McPartland stepped well beyond the proper role of any police person, well beyond. After the prosecution was commenced, she went to people and encouraged them to discharge Radokia. When Radokia's parents came to the station to bail him out, she lied to him and said, lied to them, and said, your son has inflicted incredible pain on a massive amount of children. He has forced children to orally copulate him. Do not bail him out. She went and she interfered with his relationship with the school. This was a governmental predator inflicting her warped views on everybody in her wake. It wasn't she's not shy about it. She's not shy about it. She told this to everyone. She admitted she told it to her supervisors at LAPD. She herself was a supervisor at LAPD with the concept that no, if a teacher is a male and in a school, he is necessarily a pedophile. And that's what prompted this outrageous, distorted investigation. There was no legitimate probable cause because she ignored all of the exculpatory and inconsistent. You feel like you've exceeded your time by over four minutes. Thank you. Thank you for listening. Thank you. Good morning, Your Honors. Blythe Bach on behalf of the City of Los Angeles. I'd like to, it sounds like Your Honors are pretty familiar with the record, but I would like to just point you to. We lost our job. When it comes to probable cause, as you have recognized, it's a pretty narrow focus here. Did the officer, was there a fair probability that a reasonable officer would believe that a crime had occurred? And I think that it's really undeniable here that at the moment that this investigation was taking place, there were certainly many levels that would lead to probable cause. We had not just one child witness, but two child witnesses. The appellants are focusing on the one child, the Powell child, but that is ignoring the fact that there is the second child who, although she was reluctant initially, she did ultimately tell her mother that, yes, it did occur. So we have an officer face with not just one, but two child witnesses. One of those witnesses was remarkably consistent in her accounts. Although the appellants keep saying, oh, the facts were distorted and that stuff was left out, really nothing's been pointed to in the record that is actually untrue. The reports were absolutely untrue. And it was not just this officer. It was also the nurse who examined the children, who, by the way, was at an independent agency, not an LAPD agency, but it's an independent agency that specializes in these kind of investigations. And the officer certainly considered that nurse to be an expert. And if you look at that nurse's report, the nurse again corroborates or states that the child, the children again told her really precisely the same thing as the children had said to the first initial investigating officer, Antonelli, and then McPartland, and also the nurse. That's three adults, plus the mothers, who had heard the same exact story. And that nurse, the nurse's reports on this, by the way, are at Volume 7, pages 1456 and 1422. As far as the alleged exculpatory evidence, that's not listed. The nurse conducted no physical examination. She did conduct a physical examination. Did she? She did. Are you talking about statements that she related that the girls told her? Correct. This nurse is had ñ that's her job, is to evaluate children who are making these kind of complaints. And it is a physical examination as well as she speaks with the children. And in her report, she outlines all of this for both of these children. And as far as the exculpatory evidence, I have looked at each and every allegation very carefully. I've looked at each citation to the record. I can tell you certainly there isn't, as far as the teacher, the co-teacher, who said that Rodokio was out of sight and that she had observed him. That can be found. She wrote out a timeline, actually, for the officer. And in that timeline, it specifically states, and this is at Volume 6, page 1231, specifically states the children left, the two girls left for the bathroom. Minutes later, Rodokio left, and she did not see him for, I believe it was seven to nine minutes. And subsequent to that is when the mom arrived, observed her child in the play yard, in her opinion, looking strange and acting strange. And once the child got in the car, the child ultimately related the story of what happened. Is that the mother who made prior false accusations? It is. It is. Ms. Dock, when is the earliest time that ‑‑ go ahead. No, no, it's the same mother that later admitted the accusations were false. It is, and it's unfortunate. This mother and I ‑‑ the record is very unclear, but it seems like the fact that this mother was not a credible witness was the reason why the charges got dropped. But that is a different issue than probable cause, because when an officer is looking at this, particularly when you have child witnesses and you have children making these complaints, and it's true, by the way, that children will say things like, oh, he showed me his lizard. It's just the way children sometimes relay these really horrible situations. But that didn't happen here. Well, it's unclear about the lizard you mean? Yeah. Well, it sounds like that was the child's way of opening the door into the situation. As Deborah recognizes, when you have a situation with child witnesses, it is a very unique art in working with children and trying to figure out and trying to get at whether or not there's probable cause. And here we have an officer who had these children, relied on Nurse Lake, independent people, the other adults who had received the same story from this woman. The fact that one of the children, not both of them, but one of the children had this mom who ultimately was not a credible witness doesn't disparage the fact that at the moment that McPartland was investigating this, it sounded like there was probable cause. But didn't McPartland know that this woman was not credible because the woman made known to McPartland a prior false claim? Well, McPartland herself did not believe that she was not credible. The answer to my question is yes. McPartland was on notice by the mother who made false claims that she had made a false claim before. The truth is that yes, that the mother testified at deposition that she had told McPartland about, I'm not sure about all the instances, but some of the prior complaints. According to McPartland, she had heard about one of the complaints. But the credibility of the witnesses, our position is the credibility of the witnesses, whether or not the witnesses are going to believe the trial is not an issue. But why would McPartland believe a claimant, forget witnesses, a claimant who says, by the way, I've made a false claim along these lines before, and this happened to my daughter. I mean, would a reasonable police officer take that as objective fact that a crime had been committed? Because that is one of the people involved in that. So you agree that that one should be scrubbed. You're really relying on the other mother and the nurse. I'm relying on the fact that McPartland, no, I'm relying on the child. As Detective Malinka testified, we look at the child. The fact that the mother might have a problem doesn't mean that the child, who's potentially abusive. Did McPartland talk to each of the children? I'm sorry, what? Did McPartland talk to each of the children? She did. And she got a story from each of the children, in addition to the relation by the mothers that the children had told the mothers. Right. When she was there at the CATS, C-A-T-S, agency, she spoke to the children. Okay. Honestly, it's a scary proposition, the idea that a police officer could be a judge and a jury. It's not up to a police officer to decide these kind of credibility issues. The officer's job is to investigate and determine if there's probable cause, and if there's enough there to just to make it reasonable that a crime has occurred. It's not just the duty, it's the obligation of the officer. Ms. Bosch, do you agree that when Ms. McPartland advised some babysitter employers that they should not hire Rudokia anymore, she was acting outside the scope of her employment as an L.A. police officer? I don't believe that that would have been condoned by the LAPD. Could you please listen to my question and answer yes or no? With respect of McPartland's actions in advising a couple that they should not allow Rudokia to be their babysitter, is it your position that was within the scope of authority of a police officer in the city of Los Angeles, or it was outside the scope? No, it was outside the scope. Okay, fine. As far as the governmental tort claim and the timeliness, unless your honors have any more questions for me on the probable cause issue. Ms. Bosch, I made a list of what I thought you were relying on. You have the co-teacher who shows up and says there was a timeline when this could have happened. You have C.S. and A.S. with a P. You have the two children, and then you're discounting, according to your response to Judge Bea, you're discounting the false-claiming mother, the mother that made a claim before. Right. So you're relying on the co-teacher and the two children, and is it Officer L-A-G-U-E at Katz? He's a nurse. A nurse, I'm sorry. Correct. That's what you're relying on for the probable cause? Right. And the fact that the children were, particularly the Powell child, was consistent to the three adults that she spoke to. The fact that both of the children had told their mothers, and as far as I could assess from looking carefully at the record, the two children didn't have interaction with each other after the incident, but they independently told their mothers about the incident. Okay. So it's not a situation where they made up this crazy story and then told their parents. They didn't have interaction with each other, but they independently told their mothers. And you say the Ninth Circuit said there's no particular way or method that the defendants here have to investigate a child molestation case. Like the plaintiff says you didn't do a good investigation because the way you did the investigation. You cite me a Ninth Circuit case that said we don't have to do it any particular way. Right. Deborah is very strong on that. Okay. An allegation that an investigation, particularly of child abuse, is not done in the way that the appellant thinks it should have been done doesn't make it unconstitutional. Okay. You have to show that the officer absolutely knew that these charges were false, knew that the person was innocent. And as much as we keep hearing this refrain about the mountain of exculpatory evidence, there's just simply nothing. The fact that the idea that, oh, it couldn't physically have occurred. It's true it was an open playground. It's true that apparently the restroom could have been visible. But it's also true we do not have evidence like a teacher coming up saying, oh, yeah, I watched him and I saw that he was not with the kids. That is just simply not in the record. The best we have is his co-teacher saying he left and I didn't see him. That's all we've got. So there's nothing exculpatory. And lastly, it's just the personal observations of the children. What I said to Justice Bee, which is that the officer actually met with the children and Well, let me ask you this. Who made the decision to go ahead and file a complaint? That's made by the what happened was it was first referred to the district attorney who, contrary to the appellant's description, didn't dismiss it or I forget the phraseology. They simply referred it to the city attorney's office. They didn't take it. They didn't take it, correct. It didn't have anything to do with the case. Because it wasn't a felony. It was a misdemeanor. Well, it depends on how it's charged. So the DA's office didn't want anything to do with this and sent it to the city attorney's office. Now, when it went to the DA's office, was the deputy there given the full story? I'm sorry, what? Was the deputy made aware of this, quote, exculpatory evidence, unquote? Well, like I say, I don't believe there was exculpatory evidence. I didn't ask you that. There's evidence that is arguably exculpatory. Was the DA made aware of that when they decided not to go ahead with this prosecution? I just need to know what evidence you're referring to when you say the potentially exculpatory evidence. Well, did the person in the DA's office get the full picture, the full report? I believe they get a package with the police reports, so that would be the initial investigation. You don't know what that DA got? Because they have a responsibility. You know, they have a responsibility not to just accept and rubber stamp what a police officer brings to them. They've got to look through it carefully themselves. Now, what was brought to the DA? Otherwise, if they don't do that, then their liability, the liability of the, I think this is the rule, the liability of the prosecutor is limited and doesn't extend beyond the damages incurred from the time an event took place all through a trial and beyond. It terminates when the complaint is issued. Right. Do you know about that case? Smitty v. Varney, I believe you're talking about. Well, I can't think of the name, but it's one that I was reversed on by Judge Sneed, and it went on and it was finally settled for the amount of the jury return. But the DA has got to make an independent investigation, so what I want to know is, the counsel has told us about this long list of what he believes to be exculpatory evidence. Now, was anything withheld from the DA? I believe that it was withheld. I believe that the filing package that goes to the DA and then the city attorney are the police reports and the reports of this task, this nurse leg. And actually, I forgot, I wanted to point out to you that although the ultimate conclusion was that there was no touching, if your honors are interested in finding that nurse leg actually did report that at least the Powell child had reported touching to her, that can be found at volume 7, page 1459. Nurse leg did report that according to her, the Powell child did report touching. And so this same package was given. The Powell child was the child of the not credible mother? Correct. Correct. So this same package was given to then the city attorney, and I think that the filing, the filing deputy files the charges. But then she actually explained in her deposition, and this is at volume 6, page 1263, what happens to a case then, which is that she makes the filing and then it goes to the trial attorney. She says the trial attorney can speak to all the witnesses, do further discovery, find out more about the case. Now, the record is silent here, but presumably the trial attorney then meets with the witnesses, and that's how the ultimate conclusion was made to dismiss the charge. We don't know that. We don't know. We don't know. We're busy. We're out for coffee. We have other things to do.  So, you know. Excuse me, your honor. I'm sorry. What do you mean by paycheck? What did you say? I didn't understand. I didn't hear what you said. You said something about a paycheck? We're busy maybe doing other things. You're speculating that all this, these good things occur. You don't know. No, we don't know, but I'm trying to just elaborate on the idea that there's nothing here to indicate a withholding of any evidence, that both of the prosecuting agencies received these reports. There's nothing to indicate that they didn't, as well as Nurse Lake's summary of her evaluation of the children. So, again, I think that the focus here is on the probable cause. We need to view it through the prism of an objective officer, not an officer, you know. As Justice Beeb pointed out, it's a difficult analysis, but truly we need to not focus on the subjective intent. Because this is, if we really mean what we say when we say that it's an objective test of probable cause, what that means is that we need to look at what was the raw data that was there. Was there a fair probability, at least, that a crime had occurred? And notwithstanding that there might ultimately be credibility issues, no case is perfect. That doesn't mean that there wasn't at least a fair probability. And when you have young children like this, we need to be diligent. The stories are fantastic. Who would have ever dreamed of a teacher with these stories that we're hearing today? They're horrible stories. If we disregarded them and just took them as, oh, that's just children talking about being blindfolded and, you know. No, no. I'm saying in the news today we learn that we need to take it very seriously. And that's how the LAPD takes it. You're four minutes over your time, and that is the time you're arguing also. Thank you. I just have some real quick points if I may. Yeah, you've got a few minutes, I think. By the way, it didn't occur as counsel stated. First, Sonia called the school, okay? Then the school, in an abundance of caution, called the police. Then Officer Antonioni contacted CS, who denied on January 29th, 08, that Radokia had exposed himself or engaged in inappropriate conduct. Then the story grew. When they went to Katz, both Laid and McPartland asked leading questions. It's inappropriate in these type of cases. When Laid spoke with McPartland and Sonia and interviewed EP, Sonia told Laid that EP had stated, quote, Two teachers, neither whom was Radokia, would, one, take their clothes off at the school, and that Sonia had previously called the police when a babysitter hurt EP's body. Then Laid tried to lead EP, ask if Radokia had ever touched her, quote, butt, which was denied. EP then denied that anyone touched her. Laid tried to lead EP to give an incriminating statement to the effect that Radokia had exposed himself and specifically ask about Radokia's penis. When EP was asked if anyone else had seen Radokia's penis, EP said no. Okay, so we have a gross distortion. This was a witch hunt. It was physically impossible. The other child who had credibility denied it. And then eventually, after being prompted, she said that Radokia had exposed his penis in the classroom and had shaken his booty, quote, unquote, in front of the entire class and another teacher who was not there that day. This was all known to McPartland, who was simply out to shut her eyes to legitimate and objective data and who was simply out to get this acclaimed teacher. And he even threw in his face, Claudio, everyone here says you walk on water. There was no probable cause. And she misrepresented the record to Attorney Lim. Did you represent him when the case was dismissed? I did not represent him in the criminal action. And by the way, there's a good discussion of the time issue. I think it's a good discussion because it actually cites to the record and it's not interpretation. It cites to the record. It cites to the actual interpretation. At my opening brief at page 26 and 27, the only person who said, Bidler saw Radokia washing brushes. Other people saw him washing brushes 60 feet away from the shed. Sonia was already on site with her daughter. Could not have happened. And here's the question. Why didn't McPartland tell any of the prosecuting lawyers, first the district attorneys and then the city attorney, about this serious, serious problem with this woman who goes around recklessly accusing pediatricians, it's Cedars, 4-year-olds, babysitters, teenagers, her father and neighbor, that they have engaged in sexual abuse with their daughters. I'm here to answer any questions. Mr. Zubik, I have a question. On the 57th of your brief, here's what you say. This is under a heading entitled Plaintiff Presented Compelling Evidence Creating Major Triable Issues as to Whether McPartland Knew or Should Have Known that Radokia was Innocent. Here's what you say. Both the moving and opposing papers contain significant conflicting evidence demonstrating that one plaintiff was innocent of all charges. Conflicting evidence means to me that there's evidence that he's guilty. Did I miss something there? It's not well stated. I apologize. What I meant was that there were tribal issues of fact as to whether the state of mind and the data gathering techniques was such that there could have been probable cause. You have to first go to what McPartland actually knew. You can't jump then to something else and say that her false arrest report and false declarations created probable cause when, in fact, they were false and distorted. And I think it's undeniable. Well, let me just ask you, was there, in your view, conflicting evidence or not? No. Oh, okay. I think I can't say that there wasn't. You can take little pieces out of stories, the many evolving stories here that are all over the place and involved, and you can say this is consistent with a crime. Okay, and let's ignore all of this inconsistency. And then you can go to another story and say this little thing is consistent with a crime and ignore all the others. But I believe in order for there to be legitimate probable cause, it must be objective, reliable, fair-minded, even-handed evaluation, which clearly did not occur here. Okay. Okay. Thank you for your time. Thank you for your time. Okay. We'll go to number three. Valenzuela v. AAPT Security.
judges: Pratt, Pregerson, Bea